Beatriz B. Villa, Petitioner, *v.* District Court of San Juan, Respondent.

No. 932.   Argued November 27, 1933.—Decided December 11, 1933.

*V. Géigel Polanco* for petitioner.   *W. P. Colberg* for defendant in the main action.

Mr. Justice Córdova Dávila delivered the opinion of the Court.

On April 1932, petitioner Beatriz B. Villa brought, in the District Court of San Juan, an action for temporary maintenance against her husband Mariano Verdejo, under the provisions of the Special Legal Proceedings Act approved on March 9, 1905.   It was alleged in the complaint that the defendant had voluntarily deserted his wife, the plaintiff, from April 18, 1928.   It was further alleged that the plaintiff had no sufficient means to provide for her maintenance. The lower court entered judgment for the plaintiff, adjudging the defendant, Mariano Verdejo, to pay as maintenance for the plaintiff the sum of $18 monthly, to be deposited with the clerk of the court within the first five days of each month. Said judgment has not been complied with up to this time. The defendant has not paid either wholly or partially, the amount granted by the judgment.   In view of the defendant's

attitude, the plaintiff moved the court to punish as for contempt the disobedience of the defendant. After a hearing the lower court declared itself without power to punish the said defendant, on the following grounds:

(*a*) Because paragraph 3 of section 240 of the Code of Civil Procedure provides that when the judgment is for the payment of money, its enforcement shall be procured by the execution of property of the defendant, upon the issuance of the proper writ.

(*b*) Because in the Civil Code there is not the slightest indication empowering courts to punish as for contempt the disobedience to a judgment for maintenance, and because in the legal system in which said code originated the remedy sought herein did not exist.

(*c*) Because the order involved is not a decree for alimony in a suit for divorce, but a final judgment in an action for temporary maintenance, for the enforcement of which proceedings are provided in the same Code of Civil Procedure.

(*d*) Because if contempt proceedings could be instituted in cases like the present one, a crime would be established where only an obligation of a civil nature exists.

The petitioner urges that the lower court erred in rendering its decision and in failing to compel defendant Mariano Verdejo, by means of contempt proceedings, to comply with the judgment for maintenance, among other reasons because district courts have power to punish as for contempt a refusal to obey an order to pay alimony, both when the order is entered in a suit for divorce, and when it is decreed in a separate and independent action for maintenance, especially when the latter action is instituted in accordance with the summary proceeding authorized by law, as in the instant case.

In support of her contention the petitioner cites the case of *López* v. *District Court of Guayama*, 31 P.R.R. 130, where it was held that disobedience to a final order allowing alimony may be punished in proceedings for contempt. In that case,

the court cited a judgment entered in 1903 by the District Court of Arecibo, where it was said that when Congress gave to Puerto Rico a system of laws relating to marriage and divorce, it was clearly the intention that such laws should resemble in theory and practice the laws in force in the United States, and that they should be applied and enforced in accordance with American principles of jurisprudence and construed in the same manner. The court also said that in American jurisprudence the prevailing mode of enforcing the payment of alimony is by means of contempt proceedings. The Supreme Court did not accept the theory of the District Court of Arecibo and reversed its judgment in the case of *Frau* v. *Canals,* 8 P.R.R. 114. With respect to the viewpoint expressed by the District Court of Arecibo, this court said in *López* v. *District Court, supra:*

"The theory maintained by the District Court of Arecibo in 1903 may have been premature, but the principles always obtain, and when they are based on a really humane theory they must prevail. The enforcement of an order allowing alimony is more or less dilatory and its delay would cause serious injustice, as it is a question of support, and failure to comply with it, inasmuch as its object is to supply peremptory needs, would affect the very life of the persons in need, which would be much more regrettable and reproachable when there are children."

Counsel for Mariano Verdejo admits that contempt proceedings lie to enforce compliance with a decree for alimony entered in a suit for divorce, as in the case of *López* v. *District Court, supra,* but not in a separate and independent action, inasmuch as when alimony is prayed within a suit for divorce the ruling of the court granting it is an order and not a judgment, which falls within the provisions of sections 28 and 29 of the Code of Civil Procedure.

Indeed, this is not the case of an order granting temporary alimony in a suit for divorce. The action instituted by Mrs. Villa is one to obtain only maintenance, without a dissolution of the marital relation. The issue in this case is

whether, in view of the nature of the claim and of the changes brought about in the organization and functioning of our courts, these courts are authorized to punish as for contempt the disobedience to a judgment for maintenance entered in an action independent from a suit for divorce. It is well known that since the change of sovereignty our tribunals have undergone far-reaching changes. In reality the former courts have been substituted by new ones with a different organization and functioning. When the change of sovereignty occurred, the organic law of the judicial power was in force in Puerto Rico, and our courts were organized under its provisions. These courts continued to function under the same organization, with its courts of first instance and with the former *Audiencia Territorial,* having the authority and powers conferred upon them by the laws then in force. General Order No. 19, issued by General John R. Brooke, mentioned for the first time the Supreme Court of Justice, consisting of seven magistrates, and empowered it to hear all pending appeals, as well as those that might thereafter be taken, under the civil and criminal laws of procedure, which devolved upon the Supreme Court at Madrid.

General Order No. 118 of August 16, 1899, reorganizing the judiciary of Puerto Rico established a Supreme Court composed of a chief justice and four associate justices, who jointly constituted a judicial bench for all civil and criminal business. The Island was divided into five judicial districts with a district court in each, to be composed of three judges who jointly constituted a bench for civil and criminal business. Municipal courts were also established in the various municipal districts. The Organic Act of Puerto Rico, approved by Congress in 1900, continued the courts established by General Order No. 118, and authorized the Legislature to legislate from time to time as it might see fit, with respect to said courts, and any others they might deem it advisable to establish, their organization, the number of judges and officials for each, their jurisdiction, their procedure, and all other

matters affecting them. Said Act empowered the President of the United States to appoint, by and with the advice and consent of the United States Senate, the justices of the Supreme Court. By virtue of an act approved March 12, 1903, the Supreme Court was converted into a court of appeals. Said act provides that the court, in its deliberations and decisions, in all cases, civil or criminal, shall not be confined to the errors in procedure or of law only, as they are pointed out, alleged, or saved by the respective parties to the suit, or as set forth in their briefs and exceptions, but in furtherance of justice the court may also take cognizance of all the facts and proceedings in the case as they appear in the record, and likewise consider the merits thereof so as to promote justice and right and to prevent injustice and delay.

On March 10, 1904, the contentious-administrative jurisdiction was abolished, and the law and regulations respecting such jurisdiction were repealed in their entirety, it being provided that all claims formerly prosecuted under the aforesaid law and regulations should in future take the ordinary course and jurisdiction as determined in the Code of Civil Procedure approved on the same day. On that day also an act reorganizing the judiciary was approved, whereby the Island was divided into seven judicial districts, with a court in each, constituted by one judge. The Code of Civil Procedure, in its titles I and II, prescribes the powers of the courts of justice and of judicial officers.

The foregoing observations are sufficient to show that our courts have undergone significant alterations since the change of sovereignty took place. The old courts of first instance and of instruction have been superseded by the district courts; and the former *Audiencia Territorial* by this Supreme Court. The procedure of verbal and public trial (*juicio oral y público*) was extended to civil cases and the courts of general jurisdiction were empowered to issue writs of habeas corpus, certiorari, injunction, prohibition, and mandamus.

Really a new judicial system has been established, having no resemblance to the former one and copied from the American system, with some variations, as, for example, jury trial in civil actions, which has not been established in Puerto Rico. As to their powers, our courts have not only those expressly conferred by statute, but also the inherent powers of any court of justice.

The distric courts and the Supreme Court are courts of record. Ancient commentators on the common law define a court of record as one which has power to punish and imprison for contempt of its authority, and where a record of the acts and judicial proceedings are kept and preserved forever.

In accordance with the Act defining the offiense of contempt of court and providing for the punishment thereof, approved in 1902, courts shall have power to punish for contempt any person guilty, among other things, of wilful disobedience of, or resistance offered to or exerted against, any lawful, writ, mandate, or order issued or made by any such court in a suit or action pending therein. Section 7 of the Code of Civil Procedure specifically determines the powers of a court, and by its fourth subdivision provides that every court has power to compel obedience to its judgments, orders, and processes. Section 28, second subdivision, provides that every judicial officer has power to command obedience to his lawful orders, as provided in the code, and section 29 says that for the effectual exercise of the powers conferred by section 28, a judicial officer may punish for contempt in the cases provided in the code. Section 36 of the same code prescribes that when jurisdiction is, by said code, or by another statute, conferred on a court, or judicial officer, all the means necessary to carry it into effect are also given, and in the exercise of this jurisdiction, if the course of proceedings be not specially pointed out by such code or statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the said code.

In support of its holding, the lower court says that the proceeding for the execution of a decree for maintenance is prescribed in section 240 of the Code of Civil Procedure. The Supreme Court of West Virginia, in the case of *Smith* v. *Smith*, 95 S.E. 199, has held that although a decree for alimony constitutes a lien on the real estate of the party against whom it is pronounced and may be enforced by execution, it is a decree not merely for the payment of money, but for the payment of money in discharge of the high marital duty of maintenance, wherefore it may be enforced by attachment for contempt also.

Formerly, the jurisdiction of equity courts was exercised over the person of the defendant. The decrees of those courts had not the solemnity of a judgment entered by a law court, and the remedies of the common law were not available to them for the enforcement of said decrees. The payment of money could only be enforced by contempt proceedings. Equity courts in the United States are at present empowered by statute to execute their decrees in the same way as law courts execute their judgments. These statutes which thus empower equity courts, ordinarily prohibit, expressly or impliedly, the enforcement by contempt proceedings of the equitable decrees or orders for the payment of money. The case of *Smith* v. *Smith*, *supra*, holds that the West Virginia statute, which impliedly denies to courts of equity power to enforce decrees for the payment of money by contempt proceedings, is not applicable to a decree for alimony. "It is sometimes held that where the statute provides for execution and other processes for the collection of alimony, that imprisonment for contempt cannot be resorted to as an additional remedy. But the correct interpretation is that the statute conferring additional remedies did not deprive the court of their inherent power to enforce such order." Nelson, Divorce & Separation, par. 939.

The whole process of courts of equity, in the several stages of a cause, and finally to enforce their decrees, was, till the

introduction of sequestrations, in the nature of a process of contempt acting only *in personam,* and not *in rem.* But the sequestration of property was not intended to supersede proceedings by contempt, but on the contrary it was in aid of it, and resorted to either where the contemnor could not be arrested upon process, or where, having been arrested, he remained in prison, without paying obedience to the court. *O'Callaghan* v. *Callaghan,* 69 Ill. 553.

In New York, in the case of *Lansing* v. *Lansing,* 4 Lan. 377, it was held that a decree allowing alimony, as it was a money judgment which could be enforced by execution, did not authorize contempt proceedings for the enforcement thereof. This holding was questioned in the case of *Park* v. *Park,* 18 Hun. 466, decided in 1879; and in the case of *Strobridge* v. *Strobridge,* 27 Hun. 288, decided in 1880, the court sustained a contempt proceeding against a defendant who refused to comply with an order requiring him to pay a certain amount of money to his wife's attorney for the expenses of a suit for divorce. There the court seriously questioned the doctrine of *Lansing* v. *Lansing, supra,* and said:

"The extending of the use of the writ of execution to courts of equity did not deprive them of any remedy previously employed for the enforcement of their decrees."

In the case of *Cain* v. *Miller,* 191 N.W. 704, decided in 1922, the Supreme Court of Nebraska said:

"The holding that contempt proceedings may not be availed of because an execution can issue may be correct under the statute of some states, but in this state the act of 1883, by the second section, expressly provides that the remedy by execution and lien provided for by the first section shall be cumulative and shall not take away or abridge any subsisting power of the court for the enforcement of such judgments and orders. We have seen that the remedy by contempt proceedings for the nonpayment of temporary alimony is almost unanimously held to be one of the inherent powers of the court in divorce proceedings."

In the case *In re Cave,* 66 Pac. 428, decided by the Supreme Court of Washington, the doctrine that disobedience to a decree for alimony can be punished for contempt is confirmed. From the opinion of the court in said case we take the following:

"We cannot agree with counsel for petitioner that the enforcement of the remedy as decreed by courts of general equity jurisdiction must be defined by statute. Where the statute is silent as to the remedy, the court has inherent power to enforce its judgments or decrees and orders according to its equity powers. The silence of the statute in this respect does not take away any power lodged in the court by its equity jurisdiction. 3 Pom. Eq. Jur. Section 1318; 2 Daniell, Ch. Prac. 1042 et seq.; 2 Bish. Mar., Div. & Sep. Section 1114; 1 Enc. Pl. & Prac. pp. 434, 437; *O'Callaghan,* 69 Ill. 552. In this state no rule is provided by statute for the enforcement of such decrees, but the rule of attachment has been generally followed in the practice and approved by this court. In the case of *State* v. *Smith,* 17 Wash. 430, 50 Pac. 52, where the plaintiff was allowed by final decree $25 per month 'as alimony and for the support of said children,' this court said: 'It is the duty of courts to enforce their orders, and when it comes to their knowledge that such orders are not obeyed they should require and enforce such obedience by punishment for contempt.' In the case of *State* v. *Ditmar,* 19 Wash. 324, 53 Pac. 350, this court said: 'It will be conceded that, if it is out of the power of the party against whom the decree is entered to comply with its conditions, and this showing is made to the court, he has purged himself of the contempt. But the case cited is authority on the proposition that the remedies are cumulative, and that where other remedies exist, and the party has contumaciously refused to obey the decree of the court, he may be punished for contempt.' We are not disposed to depart from the rule in these cases. The case entitled *In re Van Alstine,* 21 Wash. 194, 57 Pac. 348, is cited as announcing a different rule. In that case, however, the court declared that the decree was for money, 'a decree analogous to a money judgment at law which may be enforced by process against property,' and for that reason it was held that the court was without power to require the money to be paid into court and enforce such payment by imprisonment."

In the case of *Van Dyke* v. *Van Dyke,* 54 S.E. 537, the Supreme Court of Georgia said:

"2. The point made by the demurrer is that the provision in the final decree entered in the divorce case, for counsel fees, cannot be enforced by attachment. The fees allowed were incidental to and part of the permanent alimony decreed to be paid to the wife. The enforcement by attachment of the payment of permanent alimony adjudged in the divorce decree is not an open question in this state. In *Lewis* v. *Lewis*, 80 Ga. 706, 6 S. E. 918, 12 Am. St. Rep. 281, the wife had obtained a verdict and decree for a total divorce and for a stated sum for permanent alimony, including counsel fees, and had subsequently applied for an attachment for contempt against the husband because of his failure to comply with the decree in her favor for alimony, which contempt proceeding was resisted by the husband on the ground that the court was without power to attach him for contempt for failing to pay the allowance fixed by the verdict of the jury. These facts, though not fully set forth in the official report of the case, are disclosed by the record of file in the office of the clerk of this court. It was there ruled: 'When a wife has obtained final decree for alimony, and the husband fails to comply therewith, and it is sufficiently shown to the court that this failure does not arise from lack of ability on the part of the husband to comply, it is not error for the court to compel compliance, by an order of attachment directing his imprisonment in the event of his continued disregard of the decree.' Also, in a case where no divorce suit is pending, and the husband and wife are *bona fide* in a state of separation, and alimony has been allowed as provided in Civ. Code 1895, § 2467, its payment may be enforced by attachment. *Lester* v. *Lester*, 63 Ga. 356; *Briesnick* v. *Briesnick*, 100 Ga. 57, 28 S. E. 154. The right to enforce payment of permanent alimony by contempt proceedings belongs inherently to a court having jurisdiction of divorce suits, and the demurrer was properly overruled."

The lower court says that punishment by contempt would be equivalent to the establishment of an offense where a civil obligation only exists. Also, during the discussion of this case in conference, we have asked ourselves this question; if a person is imprisoned for disobedience to an order of court directing the payment of maintenance, would his commitment be in the nature of an imprisonment for debt? Numerous decisions hold to the contrary, and perhaps it would not be inaccurate to say that the only state in the Union which upholds the affirmative of this proposition is Missouri.

The Supreme Court of Nebraska recently revoked its former ruling and has joined the great majority of the American courts, by holding that the constitutional provision forbidding imprisonment for debt is not applicable to the imprisonment as a punishment for the wilful and contumacious disobedience to the order of a court allowing temporary alimony. *Cain* v. *Miller, supra.*

Various reasons are given by the courts in upholding the proposition that the obligation to support the wife is not a debt within the meaning of the constitutional provisions against imprisonment for debt. An order for alimony is nothing more than the judicial sanction and enforcement of the duty that the husband owes to his wife and to society. The constitutional prohibition applies only to debts arising from implied or express contracts, or from negligence or fault. In reality, the imprisonment is directed as a punishment for the resistance to the order of the court, when the party who disobeys has means to comply therewith, and not simply for the nonpayment of the money. The said reasons are set forth by the courts in the following cases:

*Hurd* v. *Hurd*, (1896) 63 Minn. 443, 65 N. W. 728; *Ex parte Joutsen*, (1908) 154 Cal. 540, 98 Pac. 391; *Ex parte Perkins*, 18 Cal. 64; *Livingston* v. *Superior Ct.*, (1897) 117 Cal. 633, 38 L.R.A. 175, 49 Pac. 836; *Bowman* v. *Webster, Circuit Judge*, (1921) 214 Mich. 518, 183 N. W. 232; *In re Popejoy*, (1899) 26 Colo. 32, 77 Am. St. Rep. 222, 55 Pac. 1083; *Carlton* v. *Carlton*, (1871) 44 Ga. 216; *Lewis* v. *Lewis*, (1888) 80 Ga. 706, 12 Am. St. Rep. 281, 6 S. E. 918; *Barclay* v. *Barclay*, (1900) 184 Ill. 375, 51 L.R.A. 351, 56 N. E. 636; *Wightman* v. *Wightman*, (1867) 45 Ill. 167; *State ex rel. Huber* v. *King*, (1897) 49 La. Ann. 1503, 22 So. 887; *Adams* v. *Adams*, (1912) 80 N. J. Eq. 175, 83 Atl. 190; *Pain* v. *Pain*, (1879) 80 N. C. 322; *Mowry* v. *Bliss*, (1907) 28 R. I. 114, 65 Atl. 616; *Andrew* v. *Andrew*, (1889) 62 Vt. 495, 20 Atl. 817; *Lyon* v. *Lyon*, (1850) 21 Conn. 185; *West* v. *West*, (1920) 126 Va. 696, 101 S. E. 876; *Tolman* v. *Leonard*, (1895)

6 App. D. C. 224; *Bronk* v. *State*, (1901) 43 Fla. 461, 99 Am. St. Rep. 119, 31 So. 248; *Chase* v. *Ingalls*, (1867) 97 Mass. 524; *Ex parte Phillips*, (1920) 43 Nev. 368, 187 Pac. 311; *Sheafe* v. *Sheafe*, (1857) 36 N. H. 156; *Sheafe* v. *Laighton*, (1858) 36 N. H. 240; *Wood* v. *Wood*, (1868) 61 N.C. (Phill. L.) 538; *State ex rel. Cook* v. *Cook*, (1902) 66 Ohio St. 566, 58 L.R.A. 625, 64 N.E. 567; *State* v. *Latham*, (1916) 136 Tenn. 30, 188 S. W. 534; *Ex parte Davis*, (1908) 101 Tex. 607, 17 L.R.A. (N.S.) 1140, 111 S. W. 394; *Carnahan* v. *Carnahan*, (1906) 143 Mich. 390, 114 Am. St. Rep. 660, 107 N.W. 73, 8 Ann. Cas. 53.

In the case of *Audubon* v. *Schufeldt*, 181 U.S. 577, the Supreme Court of United States declared that alimony does not arise from any business transaction, but from the relation of marriage. It is not founded on contract, express or implied, but on the natural and legal duty of the husband to support the wife. The general obligation to support is made specific by the decree of a court of appropriate jurisdiction. Said Supreme Court concluded by saying that, generally speaking, alimony may be altered by the court at any time, as the circumstances of the parties may require.

In the case of *Romaine* v. *Chauncey*, 129 N.Y. 566, it was held by the Court of Appeals of New York that alimony was an allowance for support and maintenance, in performance of the general duty of the husband to protect his wife, having no other purpose and provided for no other object.

In the case of *State* v. *King, supra* (49 La. Ann. 1503), citation was made of sections 119 and 120 of the Louisiana Civil Code according to which the husband and the wife owe to each other mutually, fidelity, support, and assistance, and the husband is obliged to furnish her with whatever is required for the convenience of life in proportion to his means and condition. These sections embody obligations identical to those stated in sections 88 and 89 of our Civil Code (1930 ed.), according to which husband and wife shall live together and owe to each other mutual fidelity and assistance,

and the husband shall protect his wife and satisfy her needs in proportion to his condition and fortune. After copying the code provisions, the Supreme Court of Louisiana said:

"The obligations thus declared by the lawmaker are, in no sense of the word, 'debts' due by the spouses; they are simply recognized legal duties, which it is of paramount importance to the welfare of society should be not only recognized, but enforced, by the courts. An order for alimony in a divorce suit is nothing more than the judicial sanction and enforcement, under abnormal conditions, through the judiciary, of the duty by the husband to support the wife."

The Louisiana court ends its opinion with the following words:

"We have reached the conclusion, after a careful consideration of the question before us, that the district judge was in the premises acting within his jurisdiction, and possessed the 'power,' in a proper case, to punish by imprisonment a husband who had been ordered by it to pay alimony to his wife, and who had continuously refused to obey its order while able to do so. The imprisonment may, in a given case, lead up indirectly as its result to the payment of the money, but the imprisonment itself is directed as a punishment against a contempt of the court ordering it."

Not all the courts agree with this last reasoning of the Supreme Court of Louisiana which many other courts share. Thus the Supreme Court of the United States, in the case of *Gumpers* v. *Buck Stone & Range Co.*, 221 U.S. 418, said:

"If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. It is true that punishment by imprisonment may be remedial, as well as punitive, and many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant, but also in committing the defendant to prison. But imprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprisonment in such cases is not inflicted as a punishment, but is intended to be remedial by coercing the defendant to do what he had refused to

do. The decree in such cases is that the defendant stand committed unless and until he performs the affirmative act required by the court's order.

"For example: If a defendant should refuse to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance required by a decree for specific performance, he could be committed until he complied with the order. Unless these were special elements of contumacy, the refusal to pay or to comply with the order is treated as being rather in resistance to the opposite party than in contempt of the court. The order for imprisonment in this class of cases, therefore, is not to vindicate the authority of the law, but is remedial and is intended to coerce the defendant to do the thing required by the order for the benefit of the complainant. If imprisoned, as aptly said in *In re Nevitt*, 117 Fed. Rep. 451, 'he carries the keys of his prison in his own pocket'. He can end the sentence and discharge himself at any moment by doing what he had previously refused to do."

In *Ex parte Perkins, supra* (18 Cal. 64), the California court said:

". . . . . this is not a debt within the meaning of this article. The husband is bound to support the wife, yet this duty is an imperfect obligation which is not technically a debt. He does not owe her any specific amount of money, but he owes a duty to her which may be enforced by the order of a Court, compelling him to pay her money. So alimony, temporary or permanent, may be decreed by the Court, and this may be done, not in one gross sum or at one time only, but in different sums and at different times, at the discretion of the Court. Nor does this power exhaust itself by a mere provision for the actual necessary support of the wife during the litigation. But it is equally within the power of the Court to decree the payment of the legal expenses of the suit. Legal expenses may well be included in this provision, and this includes the fees to attorneys. This is not a debt, as has been decided by the Supreme Court of Connecticut in *Lyon* v. *Lyon*, 21 Conn. 185."

The Supreme Court of Nebraska, in overruling its former decisions, said:

"We are reluctant to interfere with former decisions, but where they have not become a rule of property, and pertain merely to a question of practice, and the court did not have the invaluable aid

of counsel to present both sides of the question before the basic decision was made, we should not hesitate to adopt the proper practice and set aside the erroneous decisions. The rule of *stare decisis* is not so binding in mere matters of practice as in those of substantive law.

"Despite the ideas of some would-be social reformers, it is still the legal duty of every husband to support his wife, and until this duty has been removed by the Legislature it should be enforced. When a failure to discharge this duty has been made to appear before a court of competent jurisdiction, and an order *pendente lite* has been made that he fulfill this obligation, a willful, definite and contumacious disobedience of the order by a hale and hearty man, able to earn a living, or with other means, *without just or reasonable cause* does in fact constitute a contempt of court, and may be punishable as such. To commit to jail is a harsh and drastic remedy. Of course, if the refusal is not willful, if the defaulting husband has in good faith no means wherewith to pay the alimony, and does not willfully refuse to obey the order of the court and has just or reasonable cause for his failure to comply, he may purge himself of the contempt by so showing.

"We feel justified in taking the position occupied by the majority of courts in this country upon the proposition, in overruling *Segear* v. *Segear,* and *Leeder* v. *State, supra,* and in holding that the relator, having been lawfully committed for contempt in willfully disobeying the order of the court, is not entitled to discharge by a writ of habeas corpus." *Cain* v. *Miller, supra.*

It is not necessary to continue copying from the decisions of the courts which hold that the duty to pay alimony does not constitute a debt. All the cases cited firmly uphold the doctrine that no person shall be imprisoned for debt. Following the cases adjudicated by the continental courts, we hold that the obligation contracted by the spouses to mutually assist each other is not properly a debt within the meaning of the constitutional provision.

Counsel for Mariano Verdejo argues that contempt proceedings may not be availed of when alimony is claimed in a separate action, where no divorce is sought. Generally speaking, it may be said that the courts make no distinction between an order *pendente lite* and a judgment allowing per-

manent alimony in so far as the means to enforce the pronouncement of the court are concerned. The decisions cited cover both kinds of cases indistinctly. For example, the Supreme Court of Nebraska in *Cain* v. *Miller, supra,* a case of temporary alimony, could have distinguished its prior decisions on the basis that they involved questions of permanent alimony. However, that court made no such distintion, and expressly overruled said prior decisions.

In Puerto Rico there is no reason whatever to establish any distinction. Sections 88 and 89 of the Civil Code (1930 ed.) impose on the spouses the duty of mutual assistance, the husband being obliged to protect his wife and satisfy her needs in proportion to his condition and fortune. Section 143 of the same code provides that husband and wife are obliged to support each other. A claim for support can be made by the spouse requiring support in the course of an action for divorce or in a separate action brought for that purpose. On this point there should be no doubt in Puerto Rico, inasmuch as the statute recognizes the right to exercise a separate action claiming support. The nature of the action does not change because of the fact that a separate action may be brought. The obligation is always the same and the remedies for its enforcement are identical in both cases. Whether it be called an order or a final judgment, entered in a suit for divorce or in a separate action, the mandate of the court has no other purpose than to compel performance by the defendant of the obligation contracted by him.

We have seen that in *Van Dyke* v. *Van Dyke, supra,* it was said that in a case where no divorce suit is pending, and husband and wife are *bona fide* in a state of separation, and alimony has been allowed as provided in the Civil Code, its payment may be enforced by imprisonment for contempt.

In the case of *Livingston* v. *Superior Court, supra,* the husband filed an action for support against his wife under the provision of section 176 of the California Civil Code. Alimony was granted. The wife conveyed all her property

to her daughter the same day on which the alimony was decreed, after she had been ordered to refrain from disposing of her property. She was punished for contempt. The court held that the obligation to pay alimony is not a debt within the provisions of the Constitution and that the power of the court to enforce payment thereof can not be doubted. From the opinion rendered by the California court we take the following:

" 'It is within the general powers of courts of equity independent of the statute to decree alimony to the wife without divorce.' The question has been variously decided in the United States, and it is said that in England courts of equity do not give such relief except as an incident in an action seeking some other redress. It is said in 2 Story's Equity Jurisprudence, section 1422, that to the question whether courts of equity have general authority to decret alimony to the wife when she is left without other means of maintenance, 'it can scarcely be said that according to the results of the authorities an answer in the affirmative can be given in positive terms.' This jurist says, however (section 1423), that a broader jurisdiction over the matter has been asserted by some of our courts of equity, and it has been held that 'a court of equity may in all cases decree her a suitable maintenance and support out of his estate upon the very ground that there is no adequate and sufficient remedy at law in such a case. And there is so much good sense and reason in this doctrine that it might be wished that it were generally adopted.' The question has been much discused and in many cases is very fully and elaborately considered. Among these cases, *Garland* v. *Garland,* 56 Miss. 694, contains an able review of the English cases and shows that even there some cases support the jurisdiction. *Prather* v. *Prather,* 4 Desaus. 33, contains another thorough discussion of the question, and upon principle and authority the jurisdiction of courts of equity to decree alimony is maintained. A later case in which the same doctrine is held is *Milliron* v. *Milliron* (S. D. Aug. 5, 1896), 68 N. W. Rep. 286.

"Such being the state of the authorities, there is no reason why we should not adhere to the doctrine announced in *Galland* v. *Galland,* *supra.* It is in accord with the general principle that where a right exists and there is no adequate legal remedy, equity will take jurisdiction.

"If, independently of any statute, courts of equity had jurisdiction to decreee alimony to a wife, although no divorce was sought, it would necessarily follow that they have jurisdiction when the husband applies for support from the wife. In each case the right comes from the same source—the obligations assumed by the marriage as expressed in section 155 of the Civil Code: 'Husband and wife contract toward each other obligations of mutual respect, fidelity, and support.''

In the case of *Galland* v. *Galland,* 38 Cal. 265, cited in the above extract, the Supreme Court of California wrote an elaborate opinion upholding the power of a court of equity to decree alimony in an action separately exercised.· This power, the court said, has been upheld by decisions of the Supreme Courts of Virginia, Kentucky, North Carolina, and South Carolina. It is clear that a husband is under a strong moral obligation to support his wife. The matrimonial contract and principles bind him thus. Non-compliance therewith is a grave error recognized by the common law, though no remedy exists in said law, because the wife can not sue the husband. But in equity the wife can bring an action against the husband and she can rest upon the general principle that equity courts will take jurisdiction when conscience and law recognize a right but offer no remedy. Although in Puerto Rico this is a question which offers no doubt, since under our laws a claim for support can be made in a separate action, we will copy the ruling of the Supreme Court of California in the said case:

"The statute of this State regulating divorce and alimony, entitles the wife to a divorce if the husband has deserted her for two years; and on filing her complaint, the Court is authorized to grant her alimony, *pendente lite*—and permanent alimony, if she obtains the divorce. But there is no provision of the statute which authorizes an application for alimony, except in connection with a prayer for divorce; and it is claimed on behalf of the defendant, that, inasmuch as provision is made for the allowance of alimony only on an application for divorce, it was the intention of the Legislature to limit the power of the Court to grant alimony to that class of cases. The maxim *'expressio unius est exclusio alterius'* is invoked as applicable

to this proposition. But, in my opinion, it has no application to the case. The main subject-matter of the statute was the regulation of divorce; and only as incidental to that subject the statute prescribes the power of the Court in respect to alimony in that class of cases. The Legislature was not dealing with the general subject of alimony, as an independent subject-matter of legislation; but, only, as one of the incidents of an application for divorce. It saw fit to define the power of the Court over the allowance of alimony on an aplication for divorce; but was not considering the subject of alimony in any other class of cases. If it had provided that a writ of *ne exeat* or *distringas* might issue against a defendant in an action for divorce, it would scarcely be claimed by any one that this was equivalent to a declaration that such writs should not issue in any other class of actions. For the same reason, a provision for alimony in a suit for divorce is not to be considered as a declaration that alimony shall not be allowed in other actions. The maxim which is invoked has no application to this class of cases.''

The duty that the husband owes his wife to satisfy her needs and to support her must be made effective in some way. When the aid of a court is invoked in claiming support, it is because the party bound to furnish it refuses to comply with this duty. It is not strange that this resistance should continue after the entry of a judgment granting an allowance, in which case the rights of the party favored by the judgment would be frustrated if no remedies were available for their enforcement. When the husband owns property, a writ of execution against that property can be issued; but if the allowance is granted on the basis of monthly payments, would it be just or reasonable to compel the prevailing spouse to move for a writ of execution every month? The contumacious resistance of the husband would give rise to a multiplicity of writs of execution; and it seems natural that measures should be taken to overcome such obstacles and difficulties in the administration of justice. If, on the contrary, the husband owns no property but periodically receives an income from his work as an employee or from any other source, execution proceedings would not be an adequate remedy, and similarly where the husband conceals

his property. In both these cases the ends of justice would fail and the provisions of the Civil Code would not be complied with for lack of a proper legal remedy for the enforcement thereof. Our courts are empowered by law to act, and should have, as they actually have by virtue of the same law, all the necessary means to make their jurisdiction effective. And even if the statute failed to provide those means, this deficiency would be supplied by the inherent powers of all courts and by natural justice in accordance with equity and the general principles of jurisprudence. The acts of a court should be infused with equity and justice.

In the instant case we confine ourselves to a decision of the question raised. The lower court has power to punish by contempt proceedings the wilful and contumacious disobedience to an order or judgment granting maintenance. The court a quo declared that it lacks such power. We hold the contrary and that it can avail of said power when the circumstances of the case so require it. We do not go into the merits of the case, but we hold that no person sentenced to pay alimony should be imprisoned unless a wilful and contumacious disobedience to the order of the court is shown. If the defaulting husband shows that he has no means wherewith to pay and offers a just and reasonable excuse, the court must absolve him from all responsibility inasmuch as his acts show no disobedience to the order of the court.

The order appealed from will be set aside and the case remanded for further proceedings not inconsistent with this opinion.